IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| In Re | Chapter 7 |
|---|---|
| DAVID & TAMMY EVERETT, | |
| Debtors. | Case No. 05-10399-PHX-SSC |
| | Adv. No. 05-00564 |
| ANTHONY & CONNIE HOPPER, | MEMORANDUM DECISION |
| Plaintiffs, | (Opinion to Post) |
| vs. | |
| DAVID & TAMMY EVERETT, | |
| Defendants. | |

## **I. PRELIMINARY STATEMENT**

Plaintiffs, Anthony and Connie Hopper, commenced an adversary proceeding against Tammy and David Everett, the Debtors, on July 27, 2005, to determine whether a debt due and owing to them was nondischargeable under 11 U.S.C. §523(a)(2)(A) and (B). The Defendants filed an Answer on August 15, 2005. The Court held a trial on November 15, 2006 and December 4, 2006. At the conclusion of the trial, the Court directed the parties to file simultaneous closing briefs by December 18, 2006. This matter was deemed under advisement upon receipt of the parties' closing briefs.

This Decision shall constitute the Court's findings of fact and conclusions of law

1

pursuant to Fed. R. Civ. P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§1334 and 157 (West 2006).

## II. FACTUAL DISCUSSION

In October 2003, Tammy and David Everett, the debtors herein, were the sole owners of Everett Low Voltage Co., Inc. ("ELVCO"), which was engaged in the installation of fire alarms. They had formed the Company in May 2002, and had the initial meeting of the Board of Directors.[1] It appears that another individual by the name of "Joe Fisher" was Vice President as of October 2002 and had 3500 shares of stock in ELVCO issued to him.[2] It is unclear what happened to Mr. Fisher or the stock that he owned.

In October 2003, Tammy Everett was the President and David Everett was the Secretary of ELVCO, and they continued to serve on the Board of Directors. Mr. Everett testified that they had four employees at that time, one of whom was Karry Tennant. At this time, Mr. Hopper, one of the Plaintiffs herein, became an employee of ELVCO. He had been a fire alarm technician for the previous 6 years, and he was a friend of Mr. Tennant who introduced him to the Everetts. Mr. Everett told Mr. Hopper that the Company was in need of additional employees because of a major project awarded to the Company in Florence, Arizona.

Within two weeks of his employment with the Company, Mr. Hopper was advised by Mr. Tennant that Mr. Everett was looking for a "partner." The parties disagree as to what happened next. Mr. Everett testified that he advised Mr. Hopper that Ms. Everett's father had loaned the Company $60,000 in start-up capital and that her father wanted to be repaid. Thus, the Everetts were hoping to sell a 30 percent interest in the Company to Mr. Hopper in return for his investment. The Everetts were willing to credit Mr. Hopper with any loans that he made to the Company as part of the $60,000 that needed to be paid to acquire the 30 percent interest.

---

**1.** Exhibits 1, 3, and 5.

**2.** Exhibit 7.

2

Mr. Hopper initially had a different recollection of the initial meeting. He testified that he and his wife, the other Plaintiff, traveled to the Debtors' home to discuss an investment by the Hoppers in the Company. The Debtors advised the Hoppers that the Company needed an immediate infusion of capital to meet its payroll. Mr. Hopper did have access to some of the Company's books and records, including an accounts receivable statement which appeared to list $47,869.73 in current receivables as of the end of October 2003.[3] The Hoppers agreed to provide the Company with a loan. On cross examination, Mr. Hopper conceded that the Everetts had discussed with him a 30 percent ownership interest in the Company upon the payment of $60,000. He understood that said contribution would allow the Everetts to "buy out" the interest of Ms. Everett's father in the Company. However, he did not believe that the ownership discussion had occurred at the first meeting.

Ms. Hopper testified that she was present at the initial meeting with the Everetts at the latter parties' residence. She recalled reviewing a list of the accounts receivable of the Company. She identified Exhibit B as being similar to the document that she reviewed. She does remember that the Hoppers were advised that Ms. Everett's father wished to be "bought out." She was unclear as to how he would be repaid, and the amount to be paid by the Hoppers if they chose to be investors. She was certain that the sum of $60,000 was never discussed at the initial meeting, just that the Hoppers would provide funding for the Company.

Thus, although the Everetts were clearly looking for one or more investors in the Company and notified the Hoppers that the Company was experiencing short-term cash flow problems, the Everetts told the Hoppers at the initial meeting that the Company had several new contracts and viable accounts receivable. The Company just needed a short-term cash infusion for which the Hoppers would receive an ownership interest. The Hoppers would receive credit toward the required funding for their investment by making advances to the Company. However, no specific capital contribution or the amount of the ownership interest was fixed at

---

**3.** Exhibit B.

this first meeting. It is also clear that at least Mr. Everett continued to have discussions about Mr. Hopper obtaining a 30 percent interest in the Company upon the payment of $60,000.[4]

On November 19, 2003, ELVCO and Mr. Everett, individually and as an officer of ELVCO, executed a promissory note in favor of the Plaintiffs, in the amount of $7,600, with interest at 10 percent per annum, which was payable in 30 days.[5] The Note stated that it was "secured by a clear title to the stock in the Company."[6] The Hoppers advanced the sum of $7,600 to the Company. The parties disagreed about why the Note had the notation on it that it was secured and why a stock certificate in the Company was delivered to the Hoppers. Ms. Hopper testified that she drafted the Note and that she believed that the Hoppers would receive an ownership interest in the Company for the contribution of $7,600. However, the notation on the Note is not consistent with Ms. Hopper's testimony. Since she drafted the Note, any ambiguity would necessarily be held against the Plaintiffs. The Court has also reviewed the ELVCO records from this time period, and there are additional inconsistencies. For instance, there is a Board Resolution of the Company which authorizes the loan by Mr. Hopper to the Company, allows the loan to be credited toward any capital contribution that the Hoppers may choose to make to receive a 30 percent stock ownership interest, and states that the ownership in the Company will not be transferred to the Hoppers until the full cash contribution of $60,000 is made.[7] However, there is also a Board Resolution, executed at the time of the Hopper loan,

---

**4.** At one point on cross examination, Mr. Hopper conceded that the Hoppers needed to pay $60,000 to obtain the 30 percent interest. On other occasions, Mr. Hopper denied any such understanding. The Court concludes that Mr. Hopper was aware that the Hoppers needed to make an investment of $60,000 to obtain an interest in the Company.

**5.** Exhibit 11.

**6.** Id.

**7.** Exhibit 9.

4

which appears to make Mr. Hopper a Vice President of the Company at that time.[8] There is no Board Resolution, reflecting the prior investment of Ms. Everett's father, in the amount of $60,000, which is inconsistent with the other Resolutions that the Court has reviewed.

The Court has also reviewed the stock certificate provided to the Hoppers,[9] which is inconsistent with the issued and outstanding shares of the Company. For instance, a prior Resolution of the Company and the Articles of Incorporation reflect that in October 2002, the Company had 10,000 outstanding shares, with no par value, and the Company decided to reserve 1,000 shares of its outstanding shares for an employee/stock option plan, with 4,500 shares being issued to Ms. Everett, 3,500 shares being issued to Mr. Fisher, and 1,000 shares issued to Mr. Everett.[10] So, all of the Company's outstanding shares had been issued as of the end of 2002. There are no Board Resolutions, or other documentation, which reflect that any of the shares were redeemed or repurchased by the Company. Thus, the certificate received by the Hoppers, and executed by the Everetts as the officers of the Company, is not consistent with the Company's books and records. The certificate states that it is only one share, yet it has a value of $7,700.[11] The Court cannot reconcile this discrepancy between what the Hoppers received and what they should have received. The Court concludes that for the contribution of $7,600 to the Company, the Hoppers received one share in the Company, with a value of $7,700.

Almost immediately, Mr. Hopper acquired the ability to access directly the Company's deposit account. On November 28, 2003, while the Hoppers were on vacation, Mr. Everett contacted Mr. Hopper to request an immediate advance of money from Mr. Hopper to "cover" the payroll of ELVCO. Mr. Hopper testified that he withdrew the sum of $6,400 from

---

**8.** Exhibit 10.

**9.** Exhibit 12.

**10.** Exhibits 1 and 7.

**11.** Exhibit 12.

5

the Hoppers' deposit account and directly deposited the money into ELVCO's account. The Company and Mr. Everett executed another promissory note, in the amount of $6,400, payable to the Hoppers, with interest to accrue at 10 percent per annum, and payable in 30 days.[12] Again, this Note, drafted by Ms. Hopper, reflected that it was "secured by clear title to stock" in the Company.[13] Apparently at the time the promissory note was executed by Mr. Everett, on behalf of himself and the Company, Mr. Everett advised Mr. Hopper that he would become a shareholder in ELVCO and that Mr. Everett "was working on the paperwork." This comment by Mr. Everett is inconsistent with the stock certificate that reflects that the Hoppers were already shareholders in the Company, although the Hoppers did not receive another stock certificate with this additional loan.

On December 2, 2003, Mr. Hopper advanced the sum of $2,300 to the Company to pay wages.[14] The Note had similar terms and conditions as the two previous Notes, except that this Note was executed by Ms. Everett, individually and on behalf of the Company. Thus, within a short period of time, the Hoppers had advanced the sum of $16,300 to the Company. Again, the Hoppers did not receive any additional stock in the Company.

In January 2004, the Hoppers advanced the sum of $8,600 to the Company, through a cash advance on one of their credit cards, but the Debtors and the Company did not execute a promissory note as to this advance.[15]

However, commencing in January 2004, Mr. Hopper also engaged in some troubling activity. He apparently executed an application to obtain a line of credit from Bank of

---

**12.** Exhibit 13.

**13.** Id.

**14.** Exhibit 14.

**15.** Exhibit 29.

6

America for the Company.[16] In the Application, Mr. Hopper stated that he was the President of ELVCO and that he was the 100 percent owner of the Company. Mr. Hopper conceded, at trial, that he was not President of the Company at the time, and that although he thought he had some ownership interest in the Company, he was not the 100 percent owner. Mr. Hopper's sole excuse for what he did was that "Mr. Everett told him to put that information in the Application." Mr. Hopper also apparently submitted a separate document to the Arizona Corporation Commission, dated February 9, 2004.[17] That Document stated that Mr. Hopper was the chief executive officer of the Company and that he owned 80 percent of the Company. Mr. Hopper wanted to obtain a separate license from the Registrar of Contractors for the "service and inspection" of fire alarms to broaden the business activities of the Company. This license was separate from an installation license, and apparently required Mr. Hopper to pass a test to obtain it. On the license that Mr. Hopper subsequently obtained, on March 10, 2004, he is listed as the Vice President of the Company and the qualifying party for the Company's new license, Ms. Everett is listed as the President, and Mr. Hopper is listed as having a 30 percent interest in the Company.[18] The Court is unable to reconcile Mr. Hopper's differing and conflicting statements that he made in public documents or to obtain financing on behalf of the Company. It is difficult for the Court to conclude that the Debtors misled Mr. Hopper when he was also misleading various entities. The Court is also unable to accept Mr. Hopper's explanation that such actions were appropriate because the Debtors advised him to so act. Also troubling is that the Hoppers could produce no credible documentation that stated that for a specific investment, they would obtain a specific ownership interest in the Company. The fact that Mr. Hopper listed his interest as 30 percent, 80 percent, or 100 percent on various documents admitted into evidence did not assist the Plaintiffs in their case.

---

**16.** Exhibit 15.

**17.** Exhibit 27.

**18.** Id.

7

Mr. Hopper also testified that he obtained credit cards on behalf of the Company and anticipated that the charges he made for the Company would be repaid by the Company and the Everetts. As to the Advanta credit card, Mr. Hopper advanced the sum of $2,890.45, which remains unpaid, along with accrued interest and attorneys' fee.[19] The Hoppers apparently wish to recover the sum of $22,000 for charges which were made and remain unpaid on their American Express Blue card on behalf of the business.[20] On the American Express Gold, the Hoppers seek the recovery of $3,140.81.[21] Mr. Hopper also testified that he paid the Citibank and the Capital One cards in full, which had business charges of $3,500 and $500, respectively.[22] Mr. Hopper also placed charges of $16,098.25 on a Bank of America platinum credit card on behalf of the Company.[23] Mr. Hopper obtained a Discover card, which he obtained to assist the Company and on which he placed $2,500 in Company's charges. The aggregate amount of these charges is the sum of $50,629. Mr. Hopper stated that he tried to close all of these credit card accounts when it became clear to him in March 2004 that the Company would cease operations. He testified that once he closed the accounts, the Everetts acted improperly by reopening the accounts and continuing to make charges on same.

The Court has reviewed the credit card statements for the various accounts, and cannot see any specific credit card charges by the Everetts that appear unauthorized on Mr. Hopper's account other than the <u>de minimus</u> charge by Ms. Everett of flowers for Mr. Everett's stay in the hospital.[24] Mr. Hopper also noted that it was around this time that the Everetts

---

**19.** Exhibit 31.

**20.** Exhibits 32 and 33.

**21.** Exhibits 34 and 35.

**22.** Exhibits 38 and 39.

**23.** Exhibit 36.

**24.** See Exhibits 33 and 35. However, the statements reflect the Hoppers' purchase of a timeshare on Exhibit 33 in the amount of almost $5,000.

8

decided to no longer pay his wages. However, on cross examination, Mr. Hopper conceded that he had only been unpaid for wages for the payroll periods of April 9, April 23, and May 7, 2004.[25] Although the Hoppers state that they obtained a default judgment against the Everetts in State Court, this Court was not provided with a copy of the judgment.[26] To the extent the Hoppers seek to use this alleged default judgment as a basis for their nondischargeablity claim, the Court finds that no evidence of such a default judgment was provided, and the Hoppers are precluded from seeking a nondischargeable judgment on that basis.

Of additional concern to the Court is a number of documents that the Everetts purport were sent to Mr. Hopper, which this Court is unable to verify, and there is also a document that was filed by the Company with the Arizona Corporation Commission in April 2004 that is unsigned by Mr. Hopper. It appears that the Everetts decided to have a Board Meeting on March 26, 2004, to consider Mr. Hopper's alleged fraud on the Company and to remove him as Vice President. The Court has reviewed the Exhibits, but cannot find any appropriately executed documents which reflect that Mr. Hopper, in fact, got notification of the Board Meeting which would consider his activities with the Company.[27]

The Court concludes that the Everetts and Mr. Hopper had a fundamental disagreement as to Mr. Hopper's ownership role in the Company. From the Everetts' standpoint,

---

**25.** See Docket Entry No. 24; Joint Pretrial Statement at p. 9.

**26.** The concern that the Court has is exactly as to the amount due and owing to the Hoppers. Although Mr. Hopper listed specific amounts that remained unpaid on his credit cards, some of the Exhibits from the Company reflected that the credit card balances were being paid off on a monthly basis until February or March 2004. Exhibit C. Moreover, although Mr. Hopper argues that he had not been fully reimbursed by the Company for business expenses, the Company provided documentation which showed that most of what Mr. Hopper submitted was illegible or for hotels or restaurants that did not have any business purpose. Exhibit M.

**27.** Compare Exhibits 22, 23, and 24. The Notice to Mr. Hopper is not appropriately executed by the officers of the Company. Moreover, although there is a stamped envelope with Mr. Hopper's address, it is unclear what was placed in the envelope and whether it was ever mailed.

9

1 they believed that Mr. Hopper had utilized Company credit cards for personal expenses and that
2 by April 2004, Mr. Hopper was no longer arriving for work and had abandoned the Company.
3 Mr. Hopper, on his part, thought that he would obtain a 30 percent ownership interest in the
4 Company by loaning money to the Company and by allowing the Company to use his personal
5 credit cards for business purposes. Mr. Hopper wanted to aggregate the sum of $24,900 in loans
6 to the Company with the outstanding credit card balances to support the Hoppers' contribution of
7 $60,000 to the Company. Yet the Plaintiffs had no documentation which would support that the
8 use of credit cards could somehow be aggregated toward the Hoppers' investment in the
9 Company. Moreover, the aggregate amount of the unpaid credit card balances, as testified to by
10 Mr. Hopper, exceeded the sum of $50,629. If Mr. Hopper were to receive a 30 percent
11 ownership interest upon the payment of $60,000 with credit for the loans and the credit card
12 charges and advances made, he could have contacted the Company when the credit card charges
13 and advances equaled the amount of $35,100 ($60,000 less $24,900), since all of the loans were
14 made by early January 2004. This Mr. Hopper did not do. His failure to act seriously
15 undermines his credibility as to the agreement he had with the Everetts.

### III. LEGAL ANALYSIS

A. DISCHARGEABILITY OF DEBT PURSUANT TO § 523 (a)(2)(B)

In order to prevail on a claim under 11 U.S.C.§ 523(a)(2)(B), the Plaintiff must establish that: (1) the debtor obtained money (2) through the use of a statement in writing (3) that is materially false (4) respecting the debtor's financial condition (5) on which the creditor to whom the debtor is liable for such money reasonably relied, and (6) that the debtor caused the statement to be made or published with intent to deceive. 11 U.S.C.§ 523(a)(2)(B) (West 2004).[28] The plaintiff must establish nondischargeability by a preponderance of the evidence.

---

**28.** The Ninth Circuit, in Candland Ins. Co. of N. Am (In re Candland), 90 F.3d 1466, 1469 (9th Cir.1996), "reworded" Section 523(a)(2)(B) using the elements required for a Section 523(a)(2)(A) claim. In doing so, the Candland Court quoted In re Siriani, 967 F.2d 302, 304 (9th

10

Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654, 657-58, 112 L.Ed.2d 755 (1991). Thus, the Hoppers must prove each element of fraud by a preponderance of the evidence.

Accordingly, in order to prove the obligation is non-dischargeable, the Hoppers must prove A) that the debt was obtained by use of a written statement that is materially false with respect to the Company's financial condition; B) that the Hoppers reasonably relied upon the statement; and C) that the Hoppers suffered damages as a result of their reliance on the representation.

In this case, the only substantive document the Hoppers reviewed that could possibly be construed as a "financial statement" is the accounts receivable statement they examined upon the parties initial meeting with the Everetts. The Court questions whether an accounts receivable statement constitutes a statement respecting a debtor's financial condition upon which a creditor may reasonably rely upon. In re Soderlund, 197 B.R. 742, 745 (Bankr.D.Mass.1996) (holding that the statement in writing must reflect "an entity's overall financial health"). In Medley v. Ellis, the Court noted that "[t]here are two schools of thought regarding the correct interpretation of the term financial condition. One school holds that the term 'statement respecting the debtor's or an insider's financial condition' is to be strictly construed. The second view holds that a more expansive definition of the term financial statement should be adopted." Medley v. Ellis (In re Medley), 214 B.R. 607, 611 (9th Cir. BAP 1997) (quoting Gehlhausen v. Olinger (In re Olinger), 160 B.R. 1004, 1007-08

---

Cir. 1992) (holding that, due to the substantial similarity of Sections 523(a)(2)(A) and (B), adoption of the Section 523(a)(2)(A) elements for use in Section 523(a)(2)(B) cases was appropriate). Candland, thus, held that under Section 523(a)(2)(B), a plaintiff must show that (1) the debtor made a material misrepresentation of fact; (2) he intended to deceive the creditor; (3) the debtor knew at the time that the representation was false; (4) the creditor reasonably relied on the representation; and (5) damage proximately resulted from the creditor's reliance on the representation. Id.; In re Tallant, 218 B.R. 58, 69 (9th Cir.BAP 1998). The threshold requirement is that the representation must be in the form of a written statement concerning the debtor's financial condition. *See* 11 U.S.C. § 523(a)(2)(B) (2005); Tallant, 218 B.R. at 69. So as not to confuse the issue, because the Plaintiffs have moved under both Sections 523(a)(2)(A) and (a)(2)(B), the Court will analyze the Section 523(a)(2)(B) claim using the statute's wording.

11

(Bankr.S.D.Ind.1993)).

Under the broad view, any statement respecting a debtor's financial condition will meet the definition of the term "financial statement." However, the narrow view holds that "[t]he ordinary usage of 'statement' in connection with 'financial condition' denotes either a representation of a person's overall 'net worth' or a person's overall ability to generate income." In re Mercado, 144 B.R. 879, 885 (Bankr.C.D.Cal.1992). There is no Ninth Circuit authority on this issue. In re Tallant, 218 B.R. 58 (9th Cir.BAP 1998). However, this Court will follow the Ninth Circuit Bankruptcy Appellate Panel analysis, which dictates a more expansive reading of the term "financial statement."

The only document the Hoppers reviewed that could be construed a "financial statement" is the accounts receivable statement. Even using a more expansive connotation for the term "financial statement," the Court concludes that there is insufficient information about ELVCO's financial condition or its operations for an individual to make a substantial investment. In essence, the Hoppers were making an investment which was 50 percent more than the accounts receivable shown, with no detailed aging report for the receivables, and no information as to the Company's expenses. For instance, the Company could have had expenses of $60,000 per month and been operating at a loss. Thus, the Court concludes that the statement contained insufficient information to qualify as a "statement respecting the debtor's...financial condition" under Section 523(a)(2)(B).

Moreover, the Plaintiffs failed to provide evidence that the account receivables statement contained material misrepresentations. A statement may be materially false if it includes information which is "substantially inaccurate" and is of the type that would affect the creditor's decision making process. To except a debt from discharge, the creditor must show not only that the statements are inaccurate, but also that they contain important and substantial untruths. In re Greene, 96 B.R. 279, 283 (9th Cir. BAP 1989). Mr. Everett testified that the Company had accounts receivable in the amount reflected in the statement provided to the

12

Hoppers. However, the Company had substantial operating expenses which made it difficult for the Company to meet its payroll. The Hoppers were aware of the Company's inability to meet its payroll, since they provided a number of loans to the Company, shortly after Mr. Hopper started working for ELVCO, which were expressly directed to meet payroll expenses.

The Court also concludes that the Hoppers' reliance on this one document was not reasonable. "Reasonable" reliance, while not defined by the Code, incorporates a "prudent person" test, see Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 439, 133 L.Ed.2d 351 (1995), and "is a term courts can apply without additional help." In re McGee, --- B.R. ----, 2006 WL 3627216 (9th Cir.BAP 2006) *citing* Candland, 90 F.3d at 1471. The reasonable reliance standard is determined on a case by case basis. In re McGee, 2006 WL 3627216; In re Bonnett, 895 F.2d 1155, 1157 (7th Cir. 1989). For instance, the fixed operating expenses, and the cash on hand in the bank accounts of the Company, could dramatically affect whether the accounts receivable were sufficient to keep the Company operating. As noted previously, if the fixed operating expenses for rent, salaries, raw materials, etc. were $60,000 or more a month, and the Company had little or no cash in its deposit account or accounts, the accounts receivable would be quickly utilized. Moreover, after the first loan of $7,600, the Plaintiffs continued to lend money to the Company based solely on the representation of Mr. Everett that the funding was necessary to pay the wages of employees.

Assuming, *arguendo*, that the accounts receivable listing did constitute a sufficient financial statement under § 523 (a)(2)(B), and that it was materially false, for the reasons outlined above, the Court concludes that the Hoppers' reliance thereon was not reasonable. Accordingly, the Plaintiffs have not carried the burden of proof on this issue.

B.  DISCHARGEABILITY OF DEBT PURSUANT TO § 523 (a)(2)(A)

Pursuant to 11 U.S.C. § 523(a)(2)(A), a monetary debt is nondischargeable "to the

13

extent obtained by false pretenses, a false representation, or actual fraud."[29]  In the Ninth Circuit, to prove nondischargeablity under §523(a)(2)(A), the Hoppers need to show that "(1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations." In re Diamond, 285 F.3d 822 (9th Cir. 2002); In re Slyman, 234 F.3d 1081 (9th Cir. 2000); In re Ettell, 188 F.3d 1141, 1144 (9th Cir. 1999); In re Hashemi, 104 F.3d 1122, 1125 (9th Cir. 1996); In re Eashai, 87 F.3d 1082 (9th Cir. 1996).  The plaintiff must establish nondischargeability by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654, 657-58, 112 L.Ed.2d 755 (1991). Again, the Hoppers must prove each element of fraud by a preponderance of the evidence.

In this case, the Hoppers have failed to establish all of the elements under § 523(a)(2)(A). Specifically, the Hoppers failed to carry their burden of proof by not providing evidence to substantiate the specific material misrepresentations they relied upon that would warrant a non-dischargability claim pursuant to § 523(a)(2)(A). The Court also has serious concerns regarding inconsistent testimony, as well as the aberrant behavior engaged in by the parties that the Court found to be quite troubling.

First, the Plaintiffs allege that they were to receive a 30 percent interest in the Company.  However, the stock certificate and the note reflect that the Plaintiffs made a loan of $7,600 for which they obtained a stock certificate as security for the repayment thereof.  As to

---

**29.** Section 523(a)(2)(A) states in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

....

(2) for money ... to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

14

the nature of the interest in the Company, Ms. Hopper was unclear as to what interest she anticipated, and she believed that the loan of $7,600 would provide a substantial interest in the Company when the documentation reflected only a security interest was being granted. Mr. Hopper and the Everetts seemed to testify consistently that Mr. Hopper was to receive a 30 percent interest in the Company for the payment of $60,000. However, the parties did not document how the $60,000 was to be paid. They agreed that the Hoppers would be able to credit the loans to the Company in part payment of the $60,000, but the loans only amounted to $24,900.

If the Plaintiffs wished to show that they had been defrauded, they needed to prove, from an evidentiary standpoint, that there was an agreement to allow the use of their credit cards in Company operations to be applied toward the infusion of $60,000 in capital, and that all of the credit card advances made by them, or charges incurred by the Everetts on the business or personal cards obtained by the Hoppers, in fact, were utilized for the Company's operations and remained unpaid. Moreover, as noted previously, the credit card charges or advances, that were testified to by Mr. Hopper as remaining unpaid, were so in excess of the amount necessary to equal the additional capital contribution as to affect detrimentally Mr. Hopper's credibility. Mr. Hopper and Ms. Hopper did not testify consistently as to the amount of capital necessary to obtain a 30 percent interest in the Company. Ms. Hopper believed that the loan of only $7,600 would provide her with a substantial interest in the Company. Mr. Hopper did not credibly testify that the capital infusion could be met, at least in part, by the use of credit cards obtained by him. Moreover, in reviewing all of the credit card bills, it is impossible for the Court to tell which charges were made by the Hoppers on the accounts for their personal use, which charges were for the Company for which Mr. Hopper was reimbursed, and which charges were for the Company for which Mr. Hopper received no reimbursement. As the Court has also previously noted, a few of the exhibits reflected that credit card balances were

15

being paid off on a monthly basis by the Company.[30] The Court understands that the Plaintiffs may not have kept all of the documentation to reflect the charges made by them or others for the Company, but they needed to do so, since they had the burden of proof. So, without more evidence, the Court is unable to conclude on this record, that the Hoppers paid in the requisite sum of $60,000 to acquire a 30 percent interest in the Company. Moreover, not all charges made by individuals as a Company becomes insolvent result in a debt being nondischargeable. Without actual evidence of materially false representations upon which the Plaintiffs justifiably relied, the Court is unable to enter judgment in the Plaintiffs' favor. Accordingly, the Hoppers have not shown that their obligation should be deemed a nondischargeable debt.

C.  RECOVERY BARRED UNDER DOCTRINE OF "UNCLEAN HANDS"

As the Court has outlined above, it has significant concerns regarding the behavior of all the parties in this adversary proceeding, including the Plaintiffs. Specifically, the Court finds that the Plaintiffs requested relief from the Court with "unclean hands." The doctrine of "unclean hands" demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands or he will be denied relief, regardless of the merits of his claim. Precision Co. v. Automotive Co., 324 U.S. 806, 814-815, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Hall v. Wright, 240 F.2d 787, 794-795.(9th Cir.1957)). A plaintiff with "unclean hands" is "not entitled to relief from a court of equity in the form of an order denying the dischargeability of debt." In re Uwimana, 274 F.3d 806 (4th Cir. 2001) *citing* Hutchinson v. Bromley, 126 B.R. 220, 223 (Bankr.D.Md.1991); Ingram v. Lehr, 41 F.2d 169 (9th Cir. 1930).

A court may deny relief under the doctrine of unclean hands only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief. Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933) (predicate act underlying an unclean hands defense must have an "immediate and

---

**30.** See Exhibits C and D.

Case 2:05-ap-00564-SSC    Doc 30    Filed 03/20/07    Entered 03/20/07 13:28:10    Desc
Main Document    Page 16 of 18

necessary relation to the equity that [one] seeks in respect of the matter in litigation"). The "unclean hands " defense applies to conduct immediately related to the cause in controversy. In re Houck, 199 B.R. 163 (Bankr. S.D.Ohio 1996). Accordingly, a plaintiff's unclean hands weigh in the equitable balance that underlies the design of a remedy. Adray v. Adry-Mart, Inc., 76 F.3d 984 (9th Cir. 1995).

It is not necessary that the parties plead unclean hands for the doctrine to apply. A court may raise the unclean hands doctrine sua sponte. Goldstein v. Delgratia Min. Co., 176 F.R.D. 454 (S.D.N.Y.1997). This is especially true where the facts warranting its application come to its attention - as has occurred in this matter. In re Casa Nova of Lansing, Inc., 146 B.R. 370 (Bankr.W.D. Mich.1992).

Here, given Mr. Hopper's testimony and the numerous misrepresentations that he made on public documents or to obtain a line of credit on behalf of the Company, the Court is reluctant to enter a judgment in the Hoppers' favor for being defrauded. In essence, Mr. Hopper may not rely on Mr. Everett's directing Mr. Hopper to place certain information on the documentation to be provided to public agencies as some kind of defense for Mr. Hopper's actions. Given Mr. Hopper's many different statements on the public documents as to his ownership interest in the Company, it is difficult for the Court to enter a judgment in the Plaintiffs' favor. Moreover, Mr. Hopper was unclear on public documents, or on the documentation to obtain a line of credit for the Company, whether he had a 30 percent, 80 percent, or 100 percent interest in the Company. Thus, the nature of his conduct had a direct nexus to the relief that the Hoppers were seeking – a nondischargeable debt for the failure of the Everetts to provide the Plaintiffs with a 30 percent interest in the Company. Given Mr. Hopper's statements on the aforesaid documentation, he represented to others that he had, in fact, obtained at least a 30 percent interest in the Company. How is one defrauded if he or she got exactly what was requested? Thus, the Court will utilize the doctrine of unclean hands as an additional basis not to enter judgment for the Plaintiffs.

17

# IV. CONCLUSION

Based upon the foregoing, the Court concludes that the Hoppers, as the Plaintiffs, have failed to establish all of the elements of §§ 523(a)(2)(A) and 523(a)(2)(B). The Court further finds that as a result of Mr. Hopper's own "unclean hands" in the endeavor, he is barred from now seeking to have the alleged debt deemed nondischargeable. The Court concludes that the entire debt owed to the Plaintiffs is discharged.

The Court will execute a separate order incorporating this Memorandum Decision.

DATED this 20th day of March, 2007.

*[signature]*
Honorable Sarah Sharer Curley
U. S. Bankruptcy Judge

BNC to Notice